MULLEN ET AL. v. THE WESTERN UNION BEEF COMPANY.

1. SECRETARY OF AGRICULTURE—REGULATIONS AS TO TRANSPORTING CATTLE.

The regulations promulgated by the secretary of agriculture, acting under the act of congress of May 29, 1884, for the suppression of diseases among cattle, are ineffective unless a state or territory interested in their application should determine to coöperate with him in their enforcement.

2. SAME.

After cattle have become domiciled in a state, their management is to be regulated by state laws and not by act of congress.

*Error to the District Court of Arapahoe County.*

Mr. WILLIAM C. KINGSLEY and Mr. VICTOR A. ELLIOTT, for plaintiffs in error.

Messrs. THOMAS, BRYANT & LEE, for defendant in error.

THOMSON, P. J., delivered the opinion of the court.

This action was brought by the plaintiffs in error against the defendant in error to recover damages for loss of stock occasioned by the communication from cattle of the defendant to cattle of the plaintiffs of the disease known as splenetic or Texas fever. The defendant had judgment, and the plaintiffs have brought the case here by writ of error.

The complaint charges that about the 15th day of June, 1891, the defendant negligently, wrongfully and unlawfully

VOL. IX—32

shipped from Kimble county, Texas, a large number of Texas cattle infected with Texas fever; and wrongfully, negligently and unlawfully unloaded them, and turned them loose in the vicinity of a herd of the plaintiffs' cattle, in Logan county, Colorado, and permitted them to run at large upon the range occupied by the plaintiffs' cattle, and to come in contact and become mingled with the plaintiffs' cattle, in violation of the quarantine rules, regulations and orders of the United States department of agriculture, and in violation of the quarantine rules, regulations and orders of the state of Colorado, by reason whereof the plaintiffs' cattle, which had been sound and healthy, became infected with Texas fever, and large numbers of them died. A demurrer to the complaint was overruled, and the defendant filed an answer, which was, in so far as we care to consider it, a denial of the averments of the complaint.

The cause of action, as alleged in the complaint, was the loss of cattle of the plaintiffs, occasioned by the communication to them of Texas fever by cattle of the defendant, imported into Colorado, and suffered to run at large, in violation of the quarantine rules and regulations of the department of agriculture, and in violation of the quarantine rules and regulations of the state of Colorado. The negligence complained of was alleged to consist in these violations. The case was tried below and is argued here upon the theory that if the loss of the plaintiffs' cattle was in consequence of disease communicated by the cattle of the defendant, its liability depends upon its acts with reference to rules and regulations which it was legally bound to observe; so that no question of negligence generally, in the shipment and management of the cattle, is presented by the record. We may dismiss the question of violation by the defendant of the quarantine rules and regulations of the state of Colorado by saying that, upon sufficient evidence, it was settled by the jury in the defendant's favor.

The plaintiffs introduced in evidence an order issued by Hon. J. M. Rusk, secretary of agriculture, as follows:

" REGULATIONS CONCERNING CATTLE TRANSPORTATION.
" UNITED STATES DEPARTMENT OF AGRICULTURE.
" OFFICE OF THE SECRETARY.
" WASHINGTON, D. C., February 5th, 1891.

" *To the Managers and Agents of Railroad and Transportation Companies of the United States, Stockmen and Others :*

" In accordance with section 7 of the act of congress, approved May 29th, 1884, entitled ' An Act for the Establishment of a Bureau of Animal Industry, to Prevent the Exportation of Diseased Cattle and to Provide Means for the Suppression and Extirpation of Pleuropneumonia and Other Contagious Diseases Among Domestic Animals,' and of the act of congress approved July 14th, 1890, making appropriation for the department of agriculture for the fiscal year ending June 30th, 1891, you are notified that a contagious and infectious disease known as splenetic or Southern fever exists among cattle in the following described area of the United States: * * *. From the 15th day of February to the 1st day of December, 1891, no cattle are to be transported from said area to any portion of the United States north or west of the above described line, except in accordance with the following regulations: " Here follows a series of stringent rules concerning the method to be pursued in transporting cattle from the infected districts, the purpose of which was apparently to prevent healthy cattle from coming in contact with the infection.

The plaintiffs then produced the following further order of the secretary of agriculture :

" UNITED STATES DEPARTMENT OF AGRICULTURE.
" OFFICE OF THE SECRETARY.
" WASHINGTON, D. C., April 23d, 1891.

" Notice is hereby given that cattle which have been at least ninety days in the area of country hereinafter described may be moved from said area by rail into the states of Colorado, Wyoming and Montana, for grazing purposes, in ac-

cordance with the regulations made by said states for the admission of southern cattle thereto.

"Provided:

"1. That cattle from said area shall go into said states only for slaughter or grazing, and shall on no account be shipped from said states into any other state or territory of the United States before the 1st day of December, 1891.

"2. That such cattle shall not be allowed in pens or on trails or ranges that are to be occupied or crossed by cattle going to the eastern markets before December 1, 1891, and that these two classes shall not be allowed to come in contact.

"3. That all cars which have carried cattle from said area shall, upon unloading, at once be cleaned and disinfected in the manner provided by the regulations of this department of February 5th, 1891.

"4. That the state authorities of the state of Colorado, Wyoming and Montana agree to enforce these provisions."

The territory described in both orders includes that from which the defendant's cattle were shipped; and it is the rules relating to the isolation of cattle moved from infected districts, and more particularly the second proviso of the second order, which was claimed to have been violated by the defendant. It may be conceded, for the purposes of the case, that rules or regulations, made by the direction of a statute, have the authority of the statute itself; and that their violation is, in effect, a violation of the statute; but that such may be the case, they must be clearly within its terms. The effect to be given to the foregoing orders is dependent upon the provisions of the act referred to in the order of February 5th (23 U. S. Statutes at Large, p. 31). By section 2 the commissioner of agriculture was empowered to appoint agents, whose duty it should be, under his instructions, to examine and report upon the means to be adopted for the suppression and extirpation of pleuropneumonia, and to provide against the spread, among animals, of other dan-

gerous, contagious and infectious diseases. Section 3 made it his duty to prepare such rules and regulations as he might deem proper for the speedy and effectual suppression and extirpation of the diseases referred to, and to certify such rules and regulations to the executive authority of each state and territory, and invite such authority to coöperate in the execution and enforcement of the act, authorizing him, upon the acceptance by any state or territory wherein such disease should be declared to exist, of his plans and methods, or upon the acceptance by him of plans or methods adopted for the same purpose by any such state or territory, to expend so much of the money appropriated by the act as might be necessary to prevent the spread of such diseases from one state or territory into another. Section 4 required him to make special investigation as to the existence of any of the diseases along the dividing lines between United States and foreign countries, and along the lines of transportation from all parts of the United States to ports from which live stock were exported, and report the result of his investigation to the secretary of the treasury, who should from time to time establish such regulations for the export and transportation of live stock as the result of the investigation might require. Section 5 authorized the secretary of the treasury, for the purpose of preventing exportation from the United States to foreign countries, of live stock affected with contagious diseases, to take such steps and adopt such measures, not inconsistent with the provisions of the act, as he might deem necessary. Sections 6 and 7 are as follows:

" SEC. 6. That no railroad company within the United States, or the owners or masters of any steam, or sailing, or other vessel, or boat, shall receive for transportation or transport, from one state or territory to another, or from any state into the District of Columbia, or from the district into any state, any live stock affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuropneumonia; nor shall any person, company, or corporation deliver for such transportation to any railroad com-

pany or master or owner of any boat or vessel, any live stock, knowing them to be affected with any contagious, infectious, or communicable disease; nor shall any person, company, or corporation drive on foot or transport in private conveyance from one state or territory to another, or from any state into the District of Columbia, or from the district into any state, any live stock, knowing them to be affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuropneumonia; provided, that the so-called splenetic or Texas fever shall not be considered a contagious, infectious, or communicable disease within the meaning of sections four, five, six and seven of this act, as to cattle being transported by rail to market for slaughter, when the same are unloaded only to be fed and watered in lots on the way thereto.

"Sec. 7. That it shall be the duty of the commissioner of agriculture to notify, in writing, the proper officials or agents of any railroad, steamboat, or other transportation company, doing business in or through any infected locality, and by publication in such newspapers as he may select, of the existence of said contagion; and any person or persons operating any such railroad, or master or owner of any boat or vessel, or owner or custodian of, or person having control over, such cattle or other live stock within such infected district, who shall knowingly violate the provisions of section six of this act, shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than one hundred nor more than five thousand dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment."

By subsequent legislation the department of agriculture was created, to be under the supervision and control of a secretary of agriculture, and the authority vested in the commissioner of agriculture, and the duties which the law devolved upon him, were transferred to the secretary of agriculture. Whatever orders, therefore, the commissioner could have lawfully issued, could be issued by the secretary as his

successor.  Now, the only authority of either to make rules
and regulations of any kind, in respect to cattle, is found in
the third section of the act; and that empowered him only
to prepare rules and regulations for the suppression and ex-
tirpation of the diseases.  And it seems evident to us, from
the language of the section, that it was the intention of
congress that in any measure taken by him looking to the
suppression and extirpation of the diseases, he must act in
conjunction with state or territorial authorities.  Until there
should be an agreement between him and them upon a method
to be pursued, no part of the money appropriated by the act
was available to him; so that if he should prepare rules and
regulations, they would be ineffective, unless a state or terri-
tory interested should determine to coöperate with him in
their enforcement.  Until their acceptance by the domestic
authorities, they would have no force in this state, and such
acceptance was not shown.  But aside from all this, there
was no evidence that any such rules or regulations as con-
templated by section 3 were ever made.  The order of
February 5th was expressly based on section 7.  It named
section 7 as the sole authority for its issuance.  That section
made it the secretary's duty to notify railroad, steamboat and
transportation officials, doing business in or through an in-
fected locality, of the existence of the contagion; but it gave
him no further power.  The order contained the required
notification, and to that extent was in exact conformity with
the provisions of the section; but it went further, and quali-
fied the notification by a series of rules, upon compliance with
which cattle might be removed from the territory in which
the contagion existed, to other parts of the United States.
These rules find no support in section 7.  That section simply
directed the notice to be given, and made the knowing viola-
tion of the provisions of section 6, by certain enumerated
classes of persons, a misdemeanor.  When the notice was
given, the secretary's statutory duty was fully performed;
and whatever else he assumed to do in that connection he
had no warrant for, except the dictates of his own private

judgment. Section 6 prohibits the delivery for transportation, or the transportation at all, by any person, of any live stock, with knowledge that they are infected with a communicable disease, with the qualification that Texas fever shall not be considered a communicable disease as to cattle transported by rail to market for slaughter. It is the violation of this provision which section 7 declares to be a misdemeanor. The restrictions upon the transportation of cattle are prescribed by the statute. It contains all the regulations which congress in its wisdom regarded as necessary in connection with the movement of cattle from one state or territory to another. Certainly it was not in the power of the secretary to prohibit, even qualifiedly, anything which it permitted; or to permit, even upon condition, anything which it forbade.

Counsel agree that the order of April 23d was issued as a modification of that of February 5th; and, upon its face, it would seem that it was so intended. Upon that hypothesis, its only authority was section 7; and what we have said in relation to the first order applies to it. But whether it was a modification, or an independent order, its first provision was in contravention of the statute. It assumed to permit the transportation of cattle from a district in which splenetic fever had been declared to exist to the state of Colorado for grazing. If the cattle came within the prohibition of section 7, they could be transported only for slaughter; and their transportation for any other purpose would be illegal. If they were not within its prohibition, then the parties moving them did only what they had the right under the law to do, independent of any rules or regulations, and no cause of action could arise out of their removal. The second provision undertakes to regulate the duties in relation to them of the persons by whom they might be removed, after their arrival in the state; and it is upon this provision that the plaintiff's reliance is chiefly placed. After becoming domiciled within the state, their management would be regulated by its laws, and not by the act of congress. Any violation

of the federal law in connection with the cattle would consist in their removal. The disposition of them afterwards was not within the scope of the statute. Section 3 was drawn with reference to the authority of the several states in matters pertaining to their domestic concerns. It distinctly recognized that authority; and so, we may say, did also the order of April 23d, in providing for the concurrence of the state authorities in the enforcement of the regulations it contained.

The rules promulgated by the secretary of agriculture may have been conceived in wisdom. They probably were, and, if they could be enforced, we see no reason to doubt that the results would be beneficial; but with the question of their wisdom or unwisdom we have nothing to do. They were outside of any authority conferred by the statute, and could therefore have no greater effect than perhaps as an expression of the opinion of the secretary. A disregard of their requirements would not, in itself, involve the violation of any law.

It may be that the act of transporting the cattle was contrary to the terms of the statute; and that, if so, the plaintiffs were entitled to redress for the injuries sustained. But in a case based on a violation of the statute, a number of questions would arise which this record does not present. The case at bar is not a case of that kind; and, as to it, such questions would be purely hypothetical.

The plaintiffs complain that the court erred in the admission and exclusion of evidence, and in its instructions given to the jury. We think there were some erroneous rulings in the course of the trial, but it would have been of no benefit to the plaintiffs if everything in the way of evidence which they offered had been received, and everything that they objected to had been excluded; so that the errors, if any, were harmless. We are not at liberty to review the instructions, because no proper objection was made to them when they were given; but it is not very material to the plaintiffs

whether they were good, bad or indifferent. In no view of the case, as made, were the plaintiffs entitled to a recovery.

The judgment must be affirmed.

*Affirmed.*